WESTERMAN BALL EDERER MILLER  **Hearing Date:** **November 28, 2017**
ZUCKER & SHARFSTEIN, LLP   **Time:**   **10:00 a.m.**
1201 RXR Plaza       **Objections Due:** **November 21, 2017**
Uniondale, New York 11556
 (516) 622-9200
William C. Heuer, Esq.
Mickee M. Hennessy, Esq.
John Westerman, Esq.
*Counsel to Signature Bank*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

In re:            Chapter 11

ALBERT M. LEFKOVITS,      Case No.: 17-12845-SMB

       Debtor.
--------------------------------------------------------X

## MOTION OF SIGNATURE BANK FOR RELIEF FROM
## THE AUTOMATIC STAY AND RELATED RELIEF

   Signature Bank ("**Signature**"), a secured creditor of Albert M. Lefkovits, the above-captioned chapter 11 debtor ("**Debtor**"), by its undersigned attorneys, hereby seeks entry of an Order granting Signature relief from the automatic stay (the "**Motion**"), pursuant to sections 362(d)(1) and (2) of title 11, United States Code, sections 101 *et seq.* (the "**Bankruptcy Code**") and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") to conduct a sale, pursuant to Article 9 of the New York Uniform Commercial Code, of collateral pledged as security to Signature in connection with prepetition loans for which the Debtor is a guarantor and which are in default.[1] In support of this Motion, Signature respectfully represents as follows:

---

[1] An Article 9 sale was scheduled to take place the morning after these chapter 11 proceedings were commenced (at 5:08 p.m.). This has been a consistent theme in how Debtor approaches his debt to Signature – just over a year ago, just days before the first Article 9 sale was scheduled to take place, the Debtor sought injunctive relief in state court (described more fully below).

**<u>Preliminary Statement</u>**

1.    There are two (2) loans at issue on this Motion, both of which have been in default for years.  A Notice of Events of Default was issued as far back as January 15, 2013.  Another Notice of Events of Default was issued in November 2015.  After years' worth of broken promises and failures to pay, the loans were accelerated on January 22, 2016.  An Article 9 sale was scheduled, but just before it was to take place, litigation was brought in state court by the Debtor and his related borrower entity (described below).  A temporary restraining order was entered on consent, which gave rise to a stipulation entered on consent providing that the already-scheduled Article 9 sale would be stayed on the condition that the Debtor (and his related borrower entity) posted an undertaking sufficient to cover the debt of the first loan.  That never happened.  After nearly a year went by, on June 15, 2017, the state court signed an order (filed June 28, 2017) that in sum and substance said "enough is enough."  That order provided that if the undertaking (which, by then, had been owed for nearly a year) were not in place within thirteen (13) days, the stay would automatically vacate and Signature would be permitted to sell the properties at issue.

2.    No undertaking was posted.  The stay expired.  After years of delay and nonpayment, an Article 9 sale was again scheduled for October 12, 2017.  But again, much like was the case when the first Article 9 sale was scheduled in 2016, the Debtor sought yet another stay from another court.  After the close of business (at 5:08 p.m.) the day before the rescheduled sale was to take place, the Debtor commenced these chapter 11 proceedings on October 11th.

3.    The property at issue on this Motion – the Debtor's ownership interests in two co-operative apartments used to operate Debtor's medical practice (the "**<u>Properties</u>**") – has a value of approximately $2,800,000.  The Debtor has significant judgment debt.  The Internal Revenue

Service ("**IRS**") has filed seven (7) federal tax liens against the Debtor, totaling $2,229,779.54.[2]
*See* Levin Affidavit (defined *infra*), The State of New York Department of Taxation and Finance has obtained judgments against the Debtor in the amounts of $1,063,861.60.[3] With parking violations owed, the Debtor has $3,293,845.93 in Federal and State tax and judgment lien debt. The debt owed to Signature Bank, secured by the Property, is no less than $1,765,921.78.[4] In sum, roughly $2,800,000 in assets, and $5 million in secured and judgment lien debt, while the Debtor effectively operates his Park Avenue medical practice rent-free and without keeping up with his tax obligations, with "hail mary" attempts time-after-time to have the legal process intervene at the last second before a sale takes place.

### JURISDICTION

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1334(a) and (b) and (b) and the Amended Standing Order of Reference, M-431, dated January 31, 2012.

5. This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), and (O).

6. The statutory predicates for the relief requested are Bankruptcy Code sections 362(d)(1) and (2) and Bankruptcy Rules 4001 and 9014.

---

[2] Signature Bank notes that these liens – totaling *$3,293,845.93* exclusive of what is likely substantial interest and penalties - are against the Debtor, *individually*. Multiple liens were also filed as against the Debtor's medical practice corporation, Albert M. Lefkovits, M.D., P.C. ($1,910,905.22 in federal tax liens, $736,062.78 in New York State tax liens, and parking violations, totaling $2,647,015.79). Whether there is overlap between the amounts owed by Debtor and his medical practice is unknown. The amounts indicated are approximations, in that it is likely that interest and fees will increase the amounts owed.

[3] *See* note 2, *supra*, and the comments therein.

[4] There are two (2) loans at issue: (i) a loan made in 2007 in the principal amount of $1,500,000 (of which approximately $1,630,789.56 remains unpaid) and (ii) a loan made in 2011 in the principal amount of $650,000 (of which approximately $127,554.62 remains unpaid). Signature notes that no less than $118,516.88 has been paid by Signature to cover monthly maintenance fees for the Properties – in other words, the Debtor and his business have in large part been operating on a rent-free basis. Debtor also hasn't maintained insurance for the Properties, resulting in Signature having to force-place insurance at a cost of $7,577.60. All of the amounts indicated herein are approximations based upon information available as of the petition date, and do not include fees and expenses collectible pursuant to the Loan Documents (defined *infra*) or otherwise.

# BACKGROUND

## Borrower Obtain Loans from the Bank

### A.     The First Loan

7.      On or about November 28, 2007, Signature loaned the non-debtor related entity Alfred M. Lefkovits, M.D., P.C. (the "**Medical Corporation**" and "**Borrower**") the amount of $1,500,000.00 (the "**First Loan**").  To memorialize that loan, the Debtor signed a promissory note on behalf of the Medical Corporation reflecting the terms and conditions of that loan (the "**2007 Note**").  *See* Affidavit of Robert G. Levin, filed in support of this Motion ("**Levin Aff.**"), at Exhibit A.[5]

8.      The Debtor executed an unconditional and irrevocable personal guaranty with respect to the Medical Corporation's obligations under the First Note.  *See* Exhibit B.  The Debtor also granted Signature a security interest and lien in the two cooperative apartments that Borrower used as medical offices (the Properties, defined above) and the shares in the cooperative corporation that were appurtenant to the Apartments.  Specifically, the Debtor signed Security Agreements, dated November 28, 2007, for each of the Apartments.  *See* Exhibits C and D.  Both Security Agreements explicitly provided that the Debtor would be in default if, among other things: (a) any payment due under the 2007 Note was not made on time; and (b) any payment required under the Proprietary Leases for the apartments was not made on time, such as for example maintenance.  *See* Exhibits C and D, p. 3-4.  Further, if the Debtor failed to pay "all unpaid amounts" under the 2007 Note within 30 days after written demand, Signature is explicitly permitted to sell the Apartments at a public or private sale.

---

[5] All references herein to Exhibits are references to Exhibits attached to the Levin Aff.

## B.    The Second Loan

9.    In October 2011, Signature made an additional loan to Borrower in the original principal amount of $650,000.00 (the "**Second Loan**").  The Borrower again executed and delivered to Signature a promissory note in connection with that loan (the "**2011 Note**").  *See* Exhibit E.

10.    Much like the 2007 Note, pursuant to paragraph 6(C) of the 2011 Note, upon a default the Bank could choose to accelerate the entire indebtedness.  In addition, like the 2007 Note, the 2011 Note was secured by the Properties and a related unconditional and irrevocable personal guaranty by the Debtor.  *See* Exhibit F.[6]

## C.    Defaults and Efforts to Delay Disposition of Collateral

11.    Borrower's defaults under the Loan Documents have plagued the relationship between Borrower, Debtor, and Signature practically from the get-go.  Although Borrower expressly agreed to periodically provide Signature with financial disclosures concerning its taxes and tax payments, the Borrower was in default of this obligation under the Second Loan almost immediately.  Signature never received any statements from the Borrower or its CPA attesting that Borrower was current on all of his long-term payment agreements with taxing authorities.[7] Borrower stopped providing financial disclosures in 2012.

12.    Borrower has repeatedly defaulted on its payment obligations under the Loans. Signature has been asserting its rights to payment, through counsel, since early January 2013, including rights to payment from the Debtor as guarantor.  By November 2015, however, the Loans were still not current and Signature issued a Notice of Events of Default and Reservation of Rights letter.  *See* Exhibit G.  Despite subsequent agreement to provide a partial "catch-up"

---

[6] The 2007 Note and 2011 Note shall be referred to collectively as the "**Notes**".  The First Loan and the Second Loan shall be collectively referred to as the "**Loans**."  All of the documents executed in connection with the First Loan and the Second Loan shall be referred to collectively as the "**Loan Documents**".
[7] It appears that Borrower and Debtor have been delinquent in their tax obligations for a very long time.

payment, neither Borrower nor Debtor actually made the payment that had been agreed upon and, at or about this same point in time, Signature received notice that neither Borrower nor the Debtor had been timely paying the maintenance due on the Properties.[8]

13.     As a result of the Borrower's defaults under the Loans, the Bank accelerated the debt and began efforts to collect.  After sending an acceleration letter dated January 6, 2016, Signature sent amended notices of default and acceleration dated January 22, 2016 and February 12, 2016 to Borrower and the Debtor.  *See* Exhibits H, I and J.  Defaults existed under both Loans.  During this period of time, during 2016, Signature had to pay the maintenance fees owed by the Debtor and his related business for six (6) months.  Debtor operated his business rent-free for six (6) months and still didn't bring the Loans current or reduce his tax lien debt.

14.     After notice was given, an Article 9 sale was scheduled with respect to the Properties for August 4, 2016.

15.     On August 1, 2016, Borrower and Debtor commenced an action against Signature in the Supreme Court of New York, New York County, Index No. 156384/2016 (the "**State Court**" and "**State Court Action**").  The complaint, in sum and substance, alleged breach of contract and sought an injunction.  A temporary restraining order was issued enjoining the Article 9 sale.

16.     On August 18, 2016, Signature entered into a Stipulation and Order with Debtor and Borrower pursuant to which Debtor and Borrower were granted a preliminary injunction stopping Signature's efforts to conduct an Article 9 sale, but injunctive relief was:

---

[8] In order to protect its collateral interests, Signature has been forced to make these payments, continually. Signature made these payments for six (6) months in 2016, and for seven (7) months so far in 2017.  The Debtor and his related business did not keep insurance in place, so Signature force-placed insurance.  In other words, the Debtor and his related business have in large part been operating rent-free and in effect, Signature has been forced to finance the Debtor's business.  Indeed, the practical reality of the matter is that by virtue of his having failed to pay what is owed in taxes to either the IRS or New York State, the Debtor has been forcing the IRS and New York State to finance his ongoing failed business, too.  What has been done with all of the funds generated by the business is something that can be addressed by this Court as a result of this voluntary chapter 11 filing.  Whether the Debtor's business should be before the Court as a debtor, too, is a question that ultimately may have to be addressed.

> Conditioned upon [Debtor and Borrower] posting, on or before September 19, 2016, an undertaking in the amount due for principal and interest under the Note, dated November 28, 2007, together with the amount of maintenance paid by [Signature] on [Borrower's and Debtor's] behalf[.]

*See* Exhibit K. The Stipulation and Order further provided that "in the event the undertaking is not timely posted by [Borrower and Debtor], the preliminary injunction shall be dissolved without further Order of the Court." *See id.*

17.     The undertaking was not posted. Despite efforts by Signature, the matter was not resolved. Payment was not made.

18.     Although the Debtor made a few monthly maintenance payments for the Properties after being granted relief by the State Court (in August 2016), that stopped in January 2017. Signature then had to make seven (7) more maintenance payments. Debtor and his business, taking advantage of the State Court stay while not complying with its requirements, continued to operate rent-free.

19.     Nearly a year after a stay was granted by the State Court, on June 15, 2017, the State Court entered another order in the State Court Action. *See* Exhibit L. This new order addressed the preliminary injunction, and provided that in order to keep injunctive relief in place, Borrower and Debtor were required, within thirteen (13) days of entry of the order, to post an undertaking equal to the amount of principal and interest owed to Signature, along with maintenance paid by Signature relating to the Properties. Those are the same requirements that were set by the order on consent that was entered nearly a year prior to this, but which had not been satisfied. In substance, it was a "this is your last chance" order. The order was filed on June 28, 2017.

20.     The undertaking was not posted.  Signature scheduled an Article 9 sale of the Properties for the morning of October 12, 2017.  At 5:08 p.m. on October 11th, just a matter of hours before the Article 9 sale was scheduled to take place, the Debtor-guarantor commenced these voluntary chapter 11 proceedings.

21.     The chapter 11 petition that was filed is of the "bare-bones" variety.  It provides no useful information.  Numerous schedules were not filed.  No information was given as to assets or valuation.  No information was given as to the already-known extent of debt to the IRS and New York State taxing authorities.  No information was given as to Debtor's debt to Signature.  No useful information was provided to the Court, the Office of the United States Trustee, the IRS, New York State, Signature, or any other creditor.

## RELIEF REQUESTED

22.     Signature Bank seeks relief from the automatic stay provided by section 362(a) of the Bankruptcy Code, in order to permit Signature to enforce its rights and remedies in connection with the previously-scheduled Article 9 sale of the Properties.

23.     Bankruptcy Code Section 362(d), which governs requests for relief from the automatic stay, provides:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay –
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; [or]
> >
> > (2) with respect to a stay of an act against property under subsection (a) of this section, if –
> >
> > > (A)  the debtor does not have equity in such property; and
> > >
> > > (B) such property is not necessary to an effective reorganization[.]

11 U.S.C. §§362(d)(1), (2); *see generally*, 3 COLLIER ON BANKRUPTCY ¶ 362.07 (16th ed. Resnick & Sommer 2017).[9]  Courts in this district have held that section 362(d) is mandatory, not permissive, and grant relief from the automatic stay where any of the reasons stated in 362(d) are met.  *In re Elmira Litho, Inc.*, 174 B.R. 892, 900 (Bankr. S.D.N.Y. 1994) (granting relief from stay); *In re Touloumis*, 170 B.R. 825, 827 (Bankr. S.D.N.Y. 1994) (same); *In re Kleinman*, 156 B.R. 131, 136 (Bankr. S.D.N.Y. 1993) (same).  The burden of proof is initially on the movant to demonstrate "cause," but then shifts to the Debtor for all issues other than whether there is equity in the property.  *See In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 321-22 (Bankr. S.D.N.Y. 2001) (citing, *inter alia*, *In re Elmira Litho, Inc.*, *supra*).

24.     "Cause" exists for relief from the automatic stay pursuant to section 362(d)(1). The statute expressly provides that a "lack of adequate protection" constitutes cause.  *See id.*; *see also* 3 COLLIER ON BANKRUPTCY ¶ 362.07[3][b].  Indeed, as is noted a leading treatise on bankruptcy law, "[l]ack of adequate protection is the most common basis for finding cause to grant relief."  3 COLLIER ON BANKRUPTCY ¶ 362.07[3][b].

25.     "Adequate protection" is a "flexible concept[.]"  3 COLLIER ON BANKRUPTCY ¶ 362.07[3]f].  Generally speaking, a debtor can provide adequate protection to a secured creditor in order to protect against an erosion of existing collateral value by (i) making "adequate protection" payments, (ii) providing additional lien protections (*i.e.*, liens on other property), and/or (iii) demonstrating that there is a sufficient "equity cushion" in the property at issue to make it clear that the secured creditor's collateral interests are not at risk of diminution  during the pendency of the bankruptcy case.  *See* 3 COLLIER ON BANKRUPTCY ¶¶ 362.07[3][b][i] (adequate protection payments), 362.07[3][c] (additional lien), and 362.07[3][d][i] (equity cushion).

---

[9] All references herein to Collier on Bankruptcy are to the 16th edition, Resnick & Sommer, 2017.

26.     None of these requirements (i) *have been met* or (ii) even *can be met* on the facts present.

27.     Debtor has not made payments to Signature in the postpetition period, and neither has his related business through the Borrower entity.  The Debtor's consistent failure to make payments in the prepetition period (while effectively operating rent-free and without paying for insurance to protect the Properties) indicates that it is not realistic to expect that Debtor (or Borrower) has the ability to make any such payments even while under the protection of chapter 11.  Indeed, from the staggering extent of IRS and New York State tax judgments and liens it is fair to infer that the Debtor's medical practice (Borrower) has been hopelessly insolvent for a very long time and that Signature, the IRS, and New York State have, in effect, been providing forced financing to the Debtor for years.[10]

28.     Debtor's initial chapter 11 case filings are woefully deficient and fail to demonstrate to either the Court or creditors any means by which the Debtor could provide additional collateral security to protect Signature's collateral interests from diminution during the pendency of these chapter 11 proceedings.  As is set out in the Levin Affidavit submitted in support of this Motion, the value of the Properties is woefully insufficient to satisfy the lien interests of Signature and the Federal and New York State tax liens.[11]  The Properties have a value of $2,800,000.  *See* Exhibit M.  The first priority lien debt to Signature is no less than

---

[10] As is noted above, where Signature is concerned this "forced financing" aspect of its position vis-à-vis the Debtor goes beyond the amounts advanced pursuant to the initial funding of the Loans because the Debtor has continually failed, for a year now, to pay maintenance on the Properties, forcing Signature to make ongoing additional payments in order to protect its collateral interests, and force-place insurance while Debtor leapfrogs between different courts seeking stays.

[11] Although whether an "equity cushion" exists for purposes of an adequate protection analysis under section 362(d)(1) is somewhat distinct from whether there is "equity" in the property for purposes of a section 362(d)(2) analysis, it is respectfully submitted that the full extent to which the Properties are encumbered is relevant in the adequate protection analysis.  *See In re Elmira Litho, Inc.* 174 B.R. at 901, n.6.  This is especially so on the facts present here – where the Debtor has failed to make any postpetition payments to Signature and appears unable to provide any form of adequate protection.

$1,630,789.56 on the 2007 Note, and $127,554.62 on the 2011 Note. *See* Levin Aff.[12] The Federal and New York State tax liens against the Debtor total *approximately $3,300,000*.[13] The tax lien debt, though junior in priority to the first position of Signature, will deplete any potential equity in the Properties and the reality of the matter is that the Debtor has no other assets from which to provide any source of protection to Signature.[14]

29. Finally, there is no equity cushion. Given the amount of debt owed to Signature and based on tax judgment liens, there is nothing that Debtor can assert to the contrary with any degree of credibility, let alone demonstrate to the Court. The value of the Properties is $2,800,000. There are liens of approximately of $5 million as against those assets. Debtor and his medical practice have been unable to pay maintenance fees (rent) and insurance. There is not prospect of adequate protection being provided. Signature respectfully submits that relief is appropriate and warranted under section 362(d)(1).

30. In addition to having met the requirements for relief pursuant to section 362(d)(1), Signature Bank has demonstrated that relief is appropriate pursuant to section 362(d)(2). As is noted above, there is no equity in the Properties and there can be no credible argument to the contrary. The only open question on a section 362(d)(2) analysis is whether the Properties are necessary to "an effective reorganization."

31. Even though the Debtor failed to provide the Court with any useful information for this analysis in his first day filings (*i.e.*, incomplete schedules, no Rule 1007 affidavit, etc.), the reality of the matter is that from the extent of outstanding tax lien debt, combined with the

---

[12] The amounts noted are approximations, and do not take into account fees and expenses owed pursuant to the Loan Documents or otherwise.

[13] The amounts that can be ascertained as against the Debtor, individually, total $3,293,845.93. Interest, fees, and other charges are likely to increase the total amount owed on those debts. In addition, $2,647,015.79 is owed in tax debt by the Debtor's related business. The extent to which there is overlap on the tax lien debt between what is owed by Debtor, and what is owed by his business, is unknown.

[14] If Debtor has other assets, they were not disclosed in Debtor's initial case filings.

fact that the Debtor has in large part been operating rent-free and without paying for insurance to protect the Properties, the Court can fairly infer that there is no realistic expectation of a reorganization in this case. The Debtor's assets will have to be liquidated to repay debts. Signature respectfully submits that relief is appropriate and warranted under section 362(d)(2).

## <u>CONCLUSION</u>

For each of the foregoing reasons, Signature Bank respectfully submits that "cause" exists and that relief from the automatic stay is appropriate in this case, pursuant to sections 362(d)(1) and (2) of the Bankruptcy Code, and respectfully requests that this Court grant relief from the automatic stay to permit Signature Bank to conduct the now-twice-already-scheduled Article 9 sale of the Properties, and such other relief in favor of Signature Bank as this Court deems necessary and proper.

Dated: Uniondale, New York
      November 1, 2017

                         WESTERMAN BALL EDERER MILLER
                         ZUCKER & SHARFSTEIN, LLP


                         By: */s/ William C. Heuer*
                              William C. Heuer, Esq.
                              Mickee M. Hennessy, Esq.
                              John Westerman, Esq.
                              201 RXR Plaza
                              Uniondale, New York 11556
                              (516) 622-9200

                              *Counsel to Signature Bank*

1674560