UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                                              Chapter 11

ALBERT M. LEFKOVITS,                                 Case No.: 17-12845-SMB

                                  Debtor.
------------------------------------------------------------X

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NASSAU     )

        Robert G. Levin, being duly sworn, deposes and says:

        1.        I am a Vice President of Signature Bank, charged with overseeing its Special Assets loan portfolio. I have been associated with Signature Bank for three (3) years. The matters set forth herein are based on my personal knowledge gained from my involvement with the Loans[1] at issue on Signature's Motion, and from my review of documents and information maintained by Signature in the ordinary course of its business.

**A.**    **The First Loan**

        2.        On or about November 28, 2007, Signature loaned the principal amount of $1,500,000 to Borrower in connection with the First Loan. To memorialize that loan, the Debtor signed the 2007 Note on behalf of the Borrower reflecting the terms and conditions of that loan. A copy of the 2007 Note is attached hereto as Exhibit A.

        3.        The Debtor executed an unconditional and irrevocable personal guaranty with respect to the Borrower's obligations under the 2007 Note. A copy of the Guaranty is attached hereto as Exhibit B.

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in Signature Motion for relief from the automatic stay, for which this Affidavit is offered in support.

4. To collateralize the 2007 Note, Debtor granted Signature a security interest and lien in the two cooperative apartments that Borrower used as medical offices - the Properties - and the shares in the cooperative corporation that were appurtenant to the Apartments.

5. To effectuate the grant of those security interests, the Debtor signed Security Agreements, dated November 28, 2007, for each of the Apartments. Copies of those Security Agreements are attached as Exhibits C and D. Both Security Agreements explicitly provided that the Debtor would be in default if, among other things: (a) any payment due under the 2007 Note was not made on time; and (b) any payment required under the Proprietary Leases for the apartments was not made on time, such as, for example, maintenance. Further, if the Debtor failed to pay "all unpaid amounts" under the 2007 Note within 30 days after written demand, Signature is explicitly permitted to sell the Apartments at a public or private sale.

6. Debtor's personal Guaranty, too, was collateralized. *See* Exhibit B, ¶ 13. The scope of the security interest and lien granted to Signature in connection with the Guaranty included all interests and liens granted pursuant to the Security Agreements noted above. *See id*. The security and lien interests granted to Signature pursuant to the Guaranty were also collateralized and extended to future advances made to Debtor by Signature. *See id*.

**B.    The Second Loan**

7. In October 2011, Signature made the Second Loan to Borrower in the original principal amount of $650,000.00. The Borrower executed and delivered to Signature the 2011 Note in connection with that loan. A copy of the 2011 Note is attached hereto as Exhibit E. Much like the 2007 Note, pursuant to the 2011 Note, upon a default the Bank could choose to accelerate the entire indebtedness.

8. In connection with the 2011 Note, the Debtor executed an unconditional and irrevocable personal guaranty. A copy of this Guaranty is attached hereto as Exhibit F. As was the case with his prior Guaranty, the 2011 Guaranty provided for the grant of security interests in the Properties and was cross-collateralized with the 2007 Note and 2007 Security Agreements. *See* Exhibit F, ¶ 13.[2]

C. **Defaults and Efforts to Delay Disposition of Collateral**

9. Borrower's Loans with Signature can fairly be characterized as having been problematic or in distress for a number of years. Although consensual resolution has proven elusive, Signature has expended substantial time and effort working with Borrower and the Debtor in an effort to address payment.

10. In November 2015, Signature issued a Notice of Events of Default and Reservation of Rights letter, a copy of which is attached hereto as Exhibit G.

11. A negotiated resolution was achieved for terms on which Borrower and Debtor would provide a partial "catch-up" payment.

12. Neither Borrower nor Debtor made the payment that had been agreed upon.

13. At or about this same point in time, Signature received notice that neither Borrower nor Debtor had been timely paying the maintenance due on the Properties.

14. As a result of the Borrower's defaults under the Loans, Signature accelerated the debt. An acceleration letter dated January 6, 2016, was sent, and thereafter Signature sent to Borrower and Debtor amended notices of default and acceleration dated January 22, 2016 and February 12, 2016, copies of which are attached hereto as Exhibits H, I and J.

---

[2] My understanding is that separate Security Agreements were executed in connection with the 2011 Note, but could not be located.

15. During this period of time, during 2016, Signature had to pay the maintenance fees (relating to the Properties) owed by the Debtor and his related business for six (6) months.

16. An Article 9 sale was scheduled with respect to the Properties for August 2, 2016.

17. On August 1, 2016, Borrower and Debtor commenced the State Court Action against Signature in the State Court. The Complaint, in sum and substance, alleged breach of contract and sought an injunction (preliminary injunctive relief was sought by way of Order to Show Cause). A temporary restraining order was issued enjoining the Article 9 sale.

18. On August 18, 2016, Signature entered into a Stipulation and Order with Debtor and Borrower pursuant to which Debtor and Borrower were granted a preliminary injunction stopping Signature's efforts to conduct an Article 9 sale, but injunctive relief was:

> Conditioned upon [Debtor and Borrower] posting, on or before September 19, 2016, an undertaking in the amount due for principal and interest under the Note, dated November 28, 2007, together with the amount of maintenance paid by [Signature] on [Borrower's and Debtor's] behalf[.]

A copy of the Stipulation and Order is attached hereto as Exhibit K.

19. The undertaking was not posted.

20. Borrower and/or Debtor made a few monthly maintenance payments for the Properties after being granted relief by the State Court (in August 2016), but that stopped in January 2017. Thereafter, Signature made seven (7) more maintenance payments.

21. On June 15, 2017, the State Court entered another order in the State Court Action, a copy of which is attached hereto as Exhibit L. This new order addressed the preliminary injunction, and provided that in order to keep injunctive relief in place, Borrower and Debtor were required, within thirteen (13) days of entry of the order, to post an undertaking equal to the

amount of principal and interest owed to Signature on the First Loan, along with maintenance that had been paid by Signature relating to the Properties.

22.  The undertaking was not posted.

23.  Signature scheduled an Article 9 sale of the Properties for the morning of October 12, 2017.

24.  At 5:08 p.m. on October 11th, just a matter of hours before the Article 9 sale was scheduled to take place, the Debtor-guarantor commenced these voluntary chapter 11 proceedings.

**D.    The Properties and the Debt Owed to Signature**

25.  The Properties consist of two cooperative apartments located at 1040 Park Avenue, New York, NY 10028, Apartments 1B and 1C and the shares appurtenant to those apartments.

26.  The collateral security and lien interests granted to Signature extend to the Properties.  *See* Exhibit B, ¶ 13 (2007 Guaranty); Exhibit C, p. 1 (Security Agreement, Apt. 1B); Exhibit D, p. 1 (Security Agreement, Apt. 10); Exhibit F, ¶ 13 (2011 Guaranty).

27.  The Properties have a value of $2,800,000.  Attached hereto as Exhibit M is an appraisal of the Properties.

28.  The first priority lien debt owed to Signature is no less than $1,630,789.56 on the 2007 Note.

29.  The second priority lien debt owed to Signature is no less than $127,554.62 on the 2011 Note.

30.  The debt amounts indicated herein are approximations, and do not include all amounts properly owed under the Loan Documents and otherwise.  Although the amounts

indicated herein are approximations, the amount owed to Signature is *not less than* what is indicated herein.

31. The debt evidenced by the 2007 Note and the 2011 Note was funded, and the collateral and security interests and liens granted to Signature "attached" to the collateral.

32. Signature's collateral and lien interests in the Properties were properly perfected. Attached hereto as Exhibit N are a Stock Power Agreement, Assignment of Lease, and UCC Filings relating to Apartment 1B (2007); as Exhibit O are a Stock Power, Assignment of Lease and UCC Filings relating to Apartment 1C (2007); as Exhibit P are UCC Filings relating to Apartment 1B (2011); and as Exhibit Q are UCC Filings relating to Apartment 1C (2011).

**E.    Tax Lien and Judgment Debt**

33. Debtor owes no less than $2,229,779.54 in federal tax debt. *See* tax lien documents attached at Exhibit R.

34. Debtor owes not less than $1,063,861.60 in tax debt to the New York Department of Taxation and Finance (my understanding is that this amount has been confirmed through a title and lien search).

35. Upon information and belief, Debtor's medical practice owes $1,910,905.22 in federal tax liens and $736,062.78 to the New York State Department of Taxation and Finance.

**F.    Debtor's Efforts to Create the Appearance of a Dispute that is not Relevant**

36. In the State Court Action and in discussions and correspondence with Signature, the Debtor and his related Borrower entity have contended that payments made under the Loans have been misapplied to one loan as compared with the other.

37. Signature disputes Debtor's and Borrower's contentions.

38.     The reality of the matter is that the contentions made by Debtor and Borrower are not relevant.

39.     It is beyond dispute that Borrower and Debtor have not paid what is owed under the Loans.

40.     It is beyond dispute that demand has been made that Guarantor pay what is owed.

41.     It is beyond dispute that Borrower and Debtor have not paid all monthly maintenance owed for the Properties, and that Signature has been required to pay substantial amounts (in excess of $118,000) to "cover" those payments.

42.     It is beyond dispute that Borrower and Debtor have not maintained insurance for the Properties, and that Signature has been required to force-place insurance.

43.     It is beyond dispute that the "undertaking" that was required by the State Court as a condition for granting injunctive relief – an agreed upon and negotiated term of the stipulation that was so-ordered by the State Court – was not posted (after either of the orders were entered by the State Court).

44.     It is beyond dispute that, shortly after the stay put in place through the State Court Action expired, and another Article 9 sale was scheduled, Debtor commenced these chapter 11 proceedings.

### G.  Conclusion

For the reasons set forth in the Motion, Signature Bank respectfully requests that this Court grant relief from the automatic stay to permit Signature Bank to conduct the now-twice-already-scheduled Article 9 sale of the Properties.

Dated:  Uniondale, New York  
       November 1, 2017                     __/s/ Robert G. Levin_____  
                                                Robert G. Levin  
                                                 Vice President, Special Assets  
                                                 Signature Bank

1676211